May it please the Court, my name is Alan Jocelyn, I am the attorney for Plaintiff Bill Fairhurst in this matter. If I may, I'd like to reserve a short time for rebuttal. How much time do you have? Okay, watch the clock. Thank you. This Court, in its 2001 decision in the case of Headwaters, Inc. v. Talon Irrigation District, found that the residue from the application into navigable waters of the U.S. herbicide approved by the Environmental Protection Agency under the federal Insecticide, Fungicide, and Rodenticide Act was a waste and a pollutant for purposes of the Clean Water Act, triggering the protective provisions of that Act. The EPA, in reaction to the Headwaters decision and in response to a fairly direct invitation from the Second Circuit Court of Appeals in the Altman case, has created a policy, a policy statement which just in the last few months has become final, a copy of which has been provided to you by Ms. Docter, representing the defendant in this matter. In that policy statement, EPA takes the position that the reason that this Court, Ninth Circuit Court of Appeals, found the residue from the FIFRA-approved herbicide in that case to be a waste and therefore a pollutant is that the herbicide was not applied in accordance with the FIFRA-approved label. That's not something that the Court found, by the way. Could have been, but didn't. EPA proposes that henceforth any FIFRA-approved herbicide or pesticide intentionally applied to waters in the U.S. consistent with the provisions of the FIFRA label and including any residue from that application be deemed not to be a waste, not to be a pollutant, meaning that the application would be exempt from the requirements and protections of the Clean Water Act. I think what you just said is if we give deference to the EPA's policy statement, then you properly lost. That's what I just said, Your Honor. Okay. And I'm here to tell you why you should. That's my purpose. The same facts here are that a FIFRA-approved pesticide, a pesticide in this case, was applied directly to navigable waters of the U.S. in accordance with the label, but without an NPDES permit. The case arises in the context of a project by the Montana Department of Fish, Wildlife, and Parks to cleanse the waters of the Cherry Creek drainage in southwestern Montana, removing brook, rainbow, and Yellowstone cutthroat trout to make room and lessen competition for a favored species, West Slope cutthroat trout. The plaintiff, Mr. Fairhurst, contends that under the Headwaters decision, an NPDES permit was required, should have been in place for this project, due to the residue remaining in the water as a waste, as evidenced by the fact that non-target organisms were and are inevitably killed, not just the target organisms. The defendant, Mr. Hagner, and consistent with the EPA policy, contends that the application of a FIFRA-approved pesticide, and including any residual waste, should be deemed not to be a waste, and therefore not a pollutant, so long as it's applied consistent with the FIFRA label. The district court agreed with that position, and with respect to the question of residue specifically, the district court found additionally that perhaps it wasn't a problem in this case because it dissipated rapidly. I viewed that to be a large Clean Water Act problem because there was no guidance as to what rapid dissipation means and what sort of facts would justify an exemption under that rationale. So the Court is presented with the question of whether or not to go along with EPA, as Your Honor has already noted. Well, the question really is whether we follow our own decision or give deference to the EPA memorandum that tried to overrule our decision. That's it. That's basically it. I think it's fairly clearly presented in that fashion. Your decision is specifically referenced in the EPA policy document. Isn't there a factual distinction between this case and Headwaters in the sense that in Headwaters, the application was in the canal? And the problem arose when the water in the canal still had the chemical when it was discharged into the other waters. Here, there was no such unintended discharge into other waters. It went into the creek and stayed in the creek. Well, Your Honor, I actually don't think there is a factual distinction there. And actually, I think the Headwaters decision came to the conclusion that the canals were, in fact, waters of the United States. So in my view, since it was a ---- It wasn't the putting of the chemical in the canal that was the problem. It was when the water in the canal got into the creek. And that, as I understand the decision, was probably the basis for the Court saying that that was residue. Right. It was what got into the creek. That was left over from the intended use. And in this case, the residue exists because of the evidence that non-target organisms were inevitably killed. But that's not residue. In other words, it's not left over as it was in Headwaters. That was the intended use of the chemical. They knew those other non-fish species were going to be affected. Well, that's one of the questions. Is it residue if it kills non-target organisms? But that's a funny definition of residue. Well, and the question also exists as to what happens if fish are killed after the intended application period has expired. It's clear that ---- You might have a residue question. It's clear that residue does remain. And I think even Judge Haddon's decision acknowledged that without really giving any guidance as to how quickly it would have to dissipate for there not to be residue. But our position is that if it's not needed for the purpose for which it's applied to kill target organisms, there is, in fact, it is residue. That's our contention. So, in other words, you can never apply a chemical if there's going to be a known but unwanted effect. Well, I wouldn't go that far. My position is that it can be applied, but Clean Water Act protections should be brought to bear, site-specific protections, to make sure that you don't have unintended consequences or more ---- Was this really unintended though? It was unwanted, but they knew these other organisms were going to be affected. So it was almost when you put it in the water, knowing it's going to affect non-fish species, that's an intended consequence. You don't ---- Yes, it's not desirable necessarily, but they certainly intended it. That's true. But there's no reason that just because you know it and intend it, that site-specific Clean Water Act protections shouldn't still be applied to make sure that it's being done in the best fashion it can be. In other words, that there is water quality-oriented supervision of the project. That's our position, and that's what we ---- that's basically what we propose. Now, the reason ---- essentially what the EPA position does is say, that's okay, we balanced the provisions of both acts because we can allow the Pfeiffer application to go forward, and there still will be some Clean Water Act protection in that if it's not done in accordance with the label, the Clean Water Act protections apply. But that is ---- and this is our problem with the way EPA is ---- has accomplished its balancing function here. The Clean Water Act protections in this instance are basically illusory. They really don't apply, which means that the EPA didn't do a good job of balancing the protections and the responsibilities of both acts. And the reason they're illusory is this. First of all, as this Court has noted previously its decisions, while the purposes of Pfeiffer and the Clean Water Act are complementary, they're different. They're not the same. And as this Court has noted, the analysis with respect to environmental effects that the EPA does under Pfeiffer are very general, and they're cost-benefit-based. Clean Water Act protections, of course, are specific to water quality, and they're site-specific as implemented through the NPDF permit program. All right. So in this case, why is it that saying that Clean Water Act protections would apply if the administration has not done in accordance with the label are illusory? Modern environmental laws are intended to be anticipatory. They're intended to anticipate and prevent harm, not to react to it. Under the EPA's proposed solution, it's an after-the-fact determination. If it's determined later that the application wasn't done in accordance with the law, Clean Water Act protections apply. But where does that leave you? I think this case provides a good example. The damage is done, first of all, if there's a problem. All right. Mr. Justice, Treeweather of the Montana Supreme Court said in a 1998 decision that was considering the protections under Montana's Constitution for the environment said something along the lines of dead fish don't have to float on the waters before the protections of our Constitution apply. Well, we'd have to alter that a little bit for purposes of this case to say non-target creatures don't have to float on the waters before the protections apply. But the point is the same. If you do an after-the-fact assessment, the anticipatory protection is gone. All right. Let's assume that you've had an application go awry. It wasn't done in accordance with the FIFRA label. Now, what recourse is available? I think this case is a good example. My client is an individual bringing a citizen suit against an agency of state government. Now, under the Clean Water Act, the incentive or, on the other side, looking at it the other way, the deterrent is the penalty provisions of the Clean Water Act. They're significant. They're $25,000 a day per occurrence, per violation. Well, that doesn't apply here. And a large number of the instances of the use of piscicide, particularly, is going to be by state agencies under the Eleventh Amendment. As Judge Haddon noted in this case, penalties aren't available and relief is prospective only. So in that regard, there isn't any Clean Water Act protection available. In my view, what that means is that EPA, in saying that it's tried to balance its responsibilities under both laws, has favored FIFRA completely at the complete expense of the Clean Water Act. It's not a balance. I think the reason EPA did that was that they look at this as being an all-or-nothing proposition. They can't find a way, and they certainly didn't find a way in this proposal to bring any reasonable balance. But that premise, I think, is the problem with this case. It doesn't have to be an all-or-nothing solution to EPA's need to find a way to try to balance what it does here. If EPA, as it obviously does, if it thinks that it has the authority to promulgate a rule that would exempt pesticides and herbicides in this fashion, it certainly would have the authority to implement a regulation that says we will do a special NPDES permit that will assure on a site-specific basis that clean water and water quality considerations are properly considered and implemented. In the end, the Clean Water Act does not contain an exception for FIFRA-approved pesticides and herbicides. It could have, but it doesn't. That means there's no basis for this sort of an exception to be applied, particularly when, as this Court has noted relatively recently, in fact, in the case of Northern Plains Resource Council versus Fidelity Development, that pollution as defined by the Clean Water Act, 33 U.S.C. section 1362, sub 19, is the man-made or man-induced alteration of the chemical integrity of the water. This clearly falls within that definition. Thank you, Your Honor. Thank you, counsel. You have 6 minutes and 26 seconds left. Good morning, Your Honors. My name is Rebecca Docter, and I'm an attorney for the Department of Fish, Wildlife and Parks for the State of Montana. I will refer to the appellee as the State during my argument. The sole issue for determination in this case is, as the appellant has incorrectly stated, whether the district court correctly determined that the piscicide and the myosin is not a pollutant within the meaning of the Clean Water Act. And the reason why that's an important distinction is because FIFRA and the Clean Water Act can be harmonized in this case, whereas it could not be harmonized in the headwaters in the case. But doesn't the requirement of the permit under the Clean Water Act impose a number of conditions, the issuance of the permit that PIPA does not require? Yes, Your Honor. If you're speaking of the NPDES permit. Yes, I am. Yes, there are. That's what they're asking for here, that they get the – that you go back or the State go back and get a permit under the Clean Water Act to – before it discharges – I guess it's already discharging, but any more of the piscicide into the water. Yes, Your Honor. The distinction here, however, is that in the headwaters in the case, the chemical, magnesite H, with its active ingredient, acrolein, or acrolein, however it's pronounced, was already determined to be a pollutant within the meaning of the Clean Water Act. And so we already had a technical violation of the Clean Water Act in that case. And the court was presented with the case of, Your Honors, it's already approved by FFRA in its label, and FFRA – further, FFRA doesn't require on its label that we get an NPDES permit, so therefore, please rule that FFRA wins out and Clean Water Act loses. Here, we don't have that Clean Water Act win, FFRA lose, or vice versa situation. In fact, what we have is a chemical that is uniquely developed for eradicating waters of a – gill-breathing organisms. And that chemical then has not already been determined to be a pollutant by EPA, by the lower court in this case, or further, by any other agency. There are many agencies across the country that use anamycin for this very purpose in their natural resource agency management purposes. So the distinction in this case, and the issue then restated, is whether or not we can harmonize FFRA and the Clean Water Act in this case, and the state asserts that we can. The Clean Water Act prohibits discharges of pollutants in the nation's waters, and that pollutant is defined as a litany of waste, dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage flood. The main one, and it goes on from there, the main one here being a chemical waste. If Congress intended that every chemical that's applied in the waters of the U.S. be a pollutant, it would have defined a pollutant as a chemical and not a chemical waste. Here, the addition of the word waste is important, as it was in the Headwaters case, as it was in Northern Plains Resource Council v. Fidelity Exploration case, because it is, as Your Honor, Nelson has already pointed out, that waste is something that's excess, left over, unused after a process, left behind in the waters. Here, in this matter, there is no excess unused portion that is left behind in the waters. Do you know that for a fact? Does it? I mean, the counsel for plaintiff suggested that the chemical does exist in the waters beyond the time that it's actually having the intended effect. Your Honor, what the appellant is arguing is that the portion of the chemical that affects non-target organisms is the residue or the waste left behind in the waters. I heard his argument a little different, differently. He was talking more about the time span after it's accomplished its intended effect and it's left over in the water or it's diluted into the water. Your Honor, what we have in the facts before us in the record, and if you'd like to refer to the excerpts of record, page 6, the andamycin label from FIFRA. And FIFRA goes through quite an extensive testing and rigorous application of the chemical in order to ensure that there are no unreasonable effects on the human environment in using the chemical when it's used in compliance with the FIFRA label. What the FIFRA label provides is that the chemical degrades. Let me quote so that I don't get it incorrect. The chemical causes no apparent harm to aquatic plants, insects, or bottom fauna. The active ingredient degrades rapidly and the reclaimed waters may be restocked, and they're talking about restocked with fish, after the treatment, after 48 hours. So in as little as 48 hours, the chemical is no longer in the water in a detectable amount that would affect fish. And even in that same amount that it's applied to affect fish, it's not affecting aquatic plants, other mammals. The only organisms that it's affecting is gill-breathing organisms, and it's a chemical developed and marketed for that purpose and used only for that purpose. And so in answering your question and referring to the record in this case, whether or not we know it for a fact that there's nothing left in the waters, we don't. What we do know is that the chemical degrades to a point where all of the intended circumstances of applying the chemical no longer happen. And so the organisms, whether non-target or target organisms, are no longer affected. And humans, plants, other animals, anyone else, any part of the ecosystem can also use the waters and ingest the fish. Further, as the lower court noted in its memorandum and opinion, the project that the state of Montana is implementing here is one that's intended to restore the biological integrity of the nation's waters, here specifically the Cherry Creek drainage. In the Cherry Creek drainage exists currently brook, rainbow, yellowstone, cutthroat, Those trout species are competition and hybridized with the genetically pure West Slope cutthroat trout. As a result, West Slope cutthroat is declining in numbers. The West Slope cutthroat has been petitioned for listing with the Endangered Species Act twice, and it's currently in its third determination of whether or not it should be listed. Consequently, taking its management responsibilities seriously, the state has implemented a comprehensive plan to restore the West Slope cutthroat trout, native fish to Montana, to its native drainage, that native drainage being the Cherry Creek drainage in this case. The use of antamycin, a chemical, concededly a chemical, not conceding that it's a waste, is needed in order to affect a project of this sort. The state and other states in the U.S. have attempted many other measures to do such a reintroduction, a restoration of waters, to restock waters with native fishes and to no avail. They need the help of this chemical. This chemical does not provide a waste in the waters. The project itself comports foursquare with the objectives of the Clean Water Act, and the Headwaters Inc. case can be disputed. The project might. I mean, the project seems to be a laudable project. But the Headwaters Court, and I recognize that it's dictum, said it would be absurd to conclude that a pesticide poured directly into the waters is anything but a pollutant under the broad scope of the Clean Water Act. And its purpose is when Congress enacted it. Your Honor, you're correct. And, in fact, it said, and I think the Court may have been happy that it didn't have to decide that issue in that case. But in this case, we do have to decide that issue. And the distinguishing factor is that the Ninth Circuit in that case was not dealing with a chemical that was being applied for the very purpose of ridding the waters of a pest species. Well, it's actually being applied to rid the waters of weeds. Of aquatic weeds, exactly. And the residual that was left behind in the nearby Bear Creek was what was determined to be the waste. Here, there is no waste when we consider the purpose for which the chemical is developed and it's being applied in accordance with that purpose. Well, now, in Headwaters, when the waste leaked out of the pipe and went into the pond or lake, whatever it did there, all of that that went into that location was waste. Is that correct? That's correct, Your Honor. Now, here, if the only thing that ended up getting killed were the trout that you wanted to kill, there wouldn't even be an argument about waste. Yes, Your Honor. But the people that wanted to kill the bad trout said, well, you know, we're going to end up killing some other things too, but that's okay because that's necessary to achieve our objective or our goal of killing the bad trout. So we'll put it in with an intentional act of killing stuff that maybe had to be killed in order to effect the proper kill of the dead trout and, therefore, there was no waste in the doing of it. Is that your argument or? That is the argument, Your Honor, because we are not considering that the non-target organisms were a wasteful part of the project. And the reason why is that we have, in this project, there were caddisfly larvae, which are gill-breathing organisms, and toad tadpoles, which are also gill-breathing organisms, that were affected in addition to the trout that were the target organisms. After the application, and this is in the stipulated facts in the record, after the application of the chemical, there was caddisfly and toads found in the project area after the application. Alive or found alive? Found alive, yes, not found dead. And so the effect of this was not to eradicate and not to kill an entire species of tadpoles or caddisfly. In fact, they were still left and possibly in larger numbers afterward because they had fish to feed on afterward. And so to sum up that argument, Your Honor, it is an intended consequence of the application of the chemicals, and, therefore, not a wasteful part of it. Maybe not desired, certainly not desired. We'd prefer that we could only target this fish, that fish, or that fish, but that's not the practical way of dealing with chemicals in this case. And if Congress intended for a chemical to be a waste, it would have defined a pollutant as chemical and not a chemical waste. Your Honors, I will conclude my argument there unless you have further discussion for me. Thank you, Your Honors. Thank you, counsel. In rebuttal, may it please the Court, in rebuttal, I would note that the antimyosin label that Ms. Doctor referred to, whereas she highlighted a 48-hour time frame, also provides since antimyosin may degrade rapidly following application, waters usually can be restocked about one week following treatment with fentanyl. So it just establishes the fact that you do have, even as acknowledged by the manufacturer, a situation where you do have residue remaining after the fact. To the extent that that's important. Well, Judge Haddon said in his order, moreover, it is unchallenged that following application, antimyosin dissipated rapidly, leaving no trace or residue in the waters to which it was applied. Was he correct that that was an unchallenged fact? I hate to disagree with Judge Haddon. I would not characterize it as being unchallenged as to, because the agreed statement of facts doesn't put it that way. The statement that I just read is in the agreed statement of facts, and it doesn't seem to comport with the way that the judge phrased it. But I thought that the, when the State applied it, that they checked to see that it was being, the effects were what it wanted. In other words, they knew what had happened in the waters to which the chemical was applied. So you had that statement also, didn't you? You did, and it is unchallenged that at some point in time after the application, there was no trace of the substance. And it didn't get into any other waters than the waters to which it was applied. Yeah, which is about a 40-mile long watershed, actually. That's true. I think the point I wanted to make in conclusion was this. Our view, my client's view, is that this method of managing the fish issue here is a wasteful sort of an approach to management. The fact is to the extent that this Court doesn't weigh in otherwise, well, but I mean, if you're talking about the wisdom of the project, that's certainly up to the State. Whether they want to manage their fishery resources this way is entirely a State decision, isn't it? Well, excuse me, Your Honor, I did mean to interrupt. No, that's fine. Okay. I think the State is in the position of every other discharger of foreign substances into waters of the U.S. It's up to them how they want to do it within the restrictions of the laws that regulate the behavior, and the State is no different. That's how I would respond to that. Because you have it. If you wanted a fisherman to argue your case to, what Judge Haddon, you had about as good an audience as you were going to get from that point of view. I've been acquainted with the judge for some years, but I do not know if he's a fisherman. In the end, why should we be stuck with something, an application that poisons the entire waterway, something that has been done since rhodenone was first discovered, wipes out whatever is susceptible to it in the entire waterway, just because that's the way it's been done. It's always been done that way. The whole purpose of the NPDES permit program is to bring site-specific controls to bear, to be technology forcing so that we aren't stuck with the way things were always done. For instance, a wasteful process like this that uses the entire water body as a vehicle to carry poisons for one target organism. An NPDES permit is renewed every five years or oftener, and its whole purpose is to reduce pollution, bring technology to bear, force the technology to develop new technology so that we don't have to have these sort of impacts on our waters. All we're saying is that why can't EPA take a little bit different tact and say, maybe that's not a bad idea, maybe we should do a special NPDES program that will allow us to require these agencies, these users of the waters, like every other user, to come along in modern times and develop the technologies to make fewer impacts on our waters. That's what we're asking. Thank you very much. Thank you, Counsel. Fairhurst versus Hegner. And we'll take up Johns versus Nifty Blue. Thank you.
judges: Thompson, T. Nelson, Wardlaw